# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| JAWAN N. TARQUINII, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 21-1567 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 60, 72 |
| | : | | |
| CARLOS DEL TORO, | : | | |
| Secretary of the Navy, | : | | |
| | : | | |
| Defendant. | : | | |

## MEMORANDUM OPINION

### GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANT'S MOTION TO SEAL

## I. INTRODUCTION

*Pro se* plaintiff Jawan Tarquinii sues Carlos Del Toro, in his official capacity as Secretary of the Navy (the "Agency"). Although Tarquinii's complaint does not list out discrete counts, so far as the Court can tell, Tarquinii alleges that she was discriminated against based on her race, sex, religion, and disability, that she was subjected to retaliation for protected activity, that she was denied a reasonable accommodation for her disability, that she was subjected to a hostile work environment, and that she was denied due process rights. *See* Compl. at 1, ECF No. 1. Before the Court is the Agency's motion for summary judgment ("Def.'s MSJ"), ECF No. 60. Tarquinii has filed a brief in opposition to the Agency's motion, *see* Pl.'s Resp. Opp'n Def.'s MSJ ("Pl.'s Opp'n"), ECF No. 65, and the Agency has filed a reply in support of its motion for summary judgment, *see* Reply Supp. Def.'s MSJ ("Def.'s Reply"), ECF No. 71. For the following reasons, the Court grants the Agency's motion for summary judgment.

## II.  BACKGROUND

Tarquinii, an African American woman who identifies as Catholic, previously worked at the Marine Corps Air Station in Iwakuni, Japan, where she served, first, as the Human Resources Deputy Director, and then as Chief of Human Resources, for Marine Corps Community Services ("Community Services").  *See* Compl. ¶¶ 13, 15–16.  While employed with Community Services, Tarquinii's first-line supervisor was Robert Johnston and her second line supervisor was John Iwaniec.  *See id.* ¶¶ 5–6; *see also* Def.'s MSJ, Ex. 1 at 109 (depicting organizational chart).[1]

In 2015, Johnston issued Plaintiff a negative mid-year performance evaluation with an accompanying Letter of Caution.  *See* Def.'s MSJ, Ex. 1 at 138.  After Tarquinii asked for a review of Johnston's decision, Iwaniec adjusted Tarquinii's evaluation to reflect that she "Meets Expectations," while continuing to express some reservations about Tarquinii's work.  *Id.* at 133. Around this time, allegations began to surface that Tarquinii had engaged in nepotism by improperly influencing Community Services to hire her husband and her brother.  *See id.*, Ex. 16 at 5–15, 18–19, 22–23, ECF No. 63-8.[2]

### a.  Inspector General Investigation

The allegations of misconduct were referred by the Office of the Inspector General to Investigator Carl D. Hodges for investigation.  *See id.*, Ex. 1 at 150.  Hodges was assisted by Carlos Saldana, the Human Resources Chief at Marine Corps Installation Pacific-Marine Corps

---

[1] Due to inconsistent page numbering, when referencing documents attached to Defendant's motion for summary judgment, the Court uses the page numbers generated by the ECF filing system.

[2] When referencing documents attached to sealed version of the Defendants' motion for summary judgment, the Court cites to ECF No. 63 and the respective attachment numbers as generated by the ECF filing system.

Base Camp Butler, in Okinawa, Japan.  *See* Def.'s MSJ at 4.  Hodges's final report for the Office of the Inspector General concluded that Tarquinii had improperly advocated for, and participated in, her husband and brother's hiring in violation of Community Services personnel policies and federal law.  *See id.*, Ex. 1 at 155–167, ECF No. 63-2.  The report further concluded that Tarquinii should have recused from any involvement in the hiring of her husband and brother but failed to do so.  *See id.*  The Inspector General report was supported by extensive and robust evidence, including statements by thirteen employees who worked with Tarquinii.  *See id.* at 152–153.

### b.  *Reasonable Accommodation Request*

Around the time of the investigation, Tarquinii submitted a reasonable accommodation request from her doctor that would allow her to have a reduced and more flexible work schedule, including some telework, for two months.  *See id.*, Ex. 14 at 2, ECF No. 60-17.  Tarquinii's request was formally approved, though Tarquinii asserts that in practice she was not permitted to have full use of that accommodation.  *See id.* at 3; *id.*, Ex. 1 at 17–18, ECF No. 60-4.  Later, Tarquinii's doctor recommended that Tarquinii's accommodation be extended for a full year. *See id.*, Ex. 15 at 2–3, ECF No. 60-18.  Given Community Services' new policy for accepting accommodation requests, it requested that Tarquinii resubmit her extended accommodation request.  *See id.*, Ex. 1 at 19, ECF No. 60-4; Def.'s Reply at 7 ("It is further undisputed that the policy for approving reasonable accommodation requests changed at some point after Plaintiff's first reasonable accommodation request in July 2015, which required Plaintiff to resubmit her second reasonable accommodation request according to that new policy.").

3

### c. Termination & Appeals Process

Before Tarquinii resubmitted her reasonable accommodation request however, her supervisors issued her a proposed termination letter, and eventually terminated her employment. *See* Def.'s MSJ, Ex. 1 at 19.  Both the notice of proposed termination and Tarquinii's termination letter explained that Tarquinii's misconduct, as found in the Inspector General Report, was the reason for her termination.  *See id.*, Ex. 1 at 30–31, 39–41.

Tarquinii then filed an appeal of her termination with the Commanding Officer at Marine Corps Air Station Iwakuni, Colonel Boucher.  *See id.* at 42.  Colonel Boucher appointed a hearing officer to help coordinate the appeal process and schedule an appeal hearing.  *See id.*, Ex. 8, ECF No. 60-11.  However, Tarquinii waived her right to an appeal hearing and requested a decision on the written submissions by the parties to the appeal, instead.  *See id.*  Ultimately, Colonel Boucher upheld the decision to terminate Plaintiff's employment after finding that there was "substantial evidence to support the conclusion that [Tarquinii] violated rules prohibiting nepotism and actual or apparent conflicts of interest on multiple occasions by the actions [she] took in connection with the employment of [her] husband and [her] brother."  *Id.* at 2–3. Tarquinii then filed a second-level appeal with Marine Corps Headquarters.  *See id.*, Ex. 9 at 2–3, ECF No. 60-12.  At that stage, the Director of the Business and Support Services Divisions at Marine Corps Headquarters, Cindy Whitman Lacy, issued a final decision upholding the decision to terminate Tarquinii's employment with Community Services.  *See id.*

### d. Equal Employment Opportunity Counseling

After her termination, but while her appeal was pending, Tarquinii initiated Equal Employment Opportunity ("EEO") Counseling.  *See id.*, Ex. 1 at 74–75, ECF No. 60-4.  In 2016, Tarquinii submitted a formal EEO Complaint alleging that the Agency had discriminated against

her based on her race, gender, religion, disability, and as reprisal for prior protected activity when it terminated her employment and when it upheld her termination. *See id.* at 6. Tarquinii's formal EEO complaint further alleged that the Agency had retaliated against her based on her prior EEO activity by interfering with her selection for employment with the U.S. Department of Justice, U.S. Navy, and U.S. Government Publishing Office. *See id.* Tarquinii later amended her formal EEO Complaint to add another retaliation claim for her non-selection to the U.S. Bureau of Engraving and Printing. *See id.*, Ex. 27 at 3, ECF No. 60-30. After her second-level appeal, Tarquinii further amended her formal EEO Complaint to allege that the Agency had discriminated and retaliated against her by denying that appeal. *See id.*, Ex. 28 at 2, ECF No. 60-31. In 2019, after the Agency sought summary judgment on Tarquinii's EEO complaint, Tarquinii attempted to amend her formal EEO complaint yet again to add claims for the denial of reasonable accommodations and the creation of a hostile work environment. *See id.*, Ex. 34 at 6–8, ECF No. 60-37. The EEO administrative judge denied the request to amend because Tarquinii raised her reasonable accommodation and hostile work environment claims for the first time only in her response to the Agency's motion for summary judgment and had previously disclaimed any reasonable accommodation or hostile work environment claim. *See id.* at 7 ("Complainant told the Agency from the get go that she sought no relief related to reasonable accommodation or hostile work environment and that those allegations were offered as background only."). The EEOC administrative judge granted summary judgment in favor of the Agency, and the Agency adopted that decision. *See id.* at 21.

### e. Complaint in District Court

Having lost her case at the agency-level, Tarquinii filed her case in this Court. *See generally* Compl. Although Tarquinii was represented by counsel in her appeal proceedings with

the Agency and before the EEOC administrative judge, she is proceeding *pro se* before this Court. *See id.*; *see also* Def.'s MSJ, Ex. 34 at 22, ECF No. 60-37; *id.*, Ex. 1 at 3, ECF No. 60-4; *id.* at 74; *id.*, Ex. 9 at 4, ECF No. 60-12.  So far as the Court can tell, Tarquinii alleges the following claims: (1) that the Agency discriminated against her by denying her a reasonable accommodation; (2) that she was discriminated against based on protected characteristics (race, sex, religion, disability) when the Agency terminated her; (3) that the Agency further discriminated against her by upholding her termination on administrative appeal; (4) that the Agency retaliated against her for protected activity by terminating her; (5) that the Agency retaliated against her by upholding her termination on administrative appeal; (6) that the Agency retaliated against her by interfering with her employment at other employers; (7) that the Agency discriminated against her by creating a hostile work environment; and (8) that the Agency deprived her of her rights under the Due Process clause.  *See* Compl. at 1–2; *see also* Def.'s MSJ, Ex. 27 at 2–3, ECF No. 60-30.

After conducting discovery, the Agency filed a motion for summary judgment.  *See generally* Def.'s MSJ.  Tarquinii filed a brief in opposition, *see generally* Pl.'s Opp'n, and the Agency filed a reply in support of its motion for summary judgment, *see generally* Def.'s Reply.  The Agency's motion for summary judgment is now ripe for review.

### III.  LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is genuine if "the evidence presents a sufficient disagreement to require submission to a jury."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

And a fact is material if it "might affect the outcome of the suit under the governing law." *Id.* at 248.

When assessing a summary judgment motion, the Court must be careful to neither "weigh the evidence" nor make determinations of witness credibility. *See id. at 249*; *Robinson v. Pezzat*, 818 F.3d 1, 8 (D.C. Cir. 2016) (highlighting the importance of separating "jury functions" from the "district court's role as the arbiter of legal questions" in considering summary judgement motions). The movant has the burden of demonstrating the absence of a genuine issue of material fact and that the non-moving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In responding to a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, it takes more than "a scintilla of evidence" to overcome a motion for summary judgment; "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249, 252. Accordingly, unsupported allegations or conclusory statements are not sufficient to defeat summary judgment, *see Ass'n of Flight Attendants-CWA v. U.S. Dep't of Transp.*, 564 F.3d 462, 465–66 (D.C. Cir. 2009); *Pub. Citizen Health Rsch. Grp. v. FDA*, 185 F.3d 898, 908 (D.C. Cir. 1999) (Garland, J., concurring) ("[C]onclusory allegations unsupported by factual data will not create a triable issue of fact." (citations and internal quotation marks omitted)).

When a non-moving party supports their position via affidavit or declaration, "[it] must set forth . . . specific facts[,]" *Ass'n of Flight Attendants-CWA*, 564 F.3d at 465 (internal

quotation marks omitted), pursuant to Rule 56(e), "that is, it 'must be made on personal

knowledge, set out facts that would be admissible in evidence, and show that the affiant is

competent to testify on the matters stated,'" *id.* (quoting Fed. R. Civ. P. 56(e)(1)).  "Although, as

a rule, statements made by the party opposing a motion for summary judgment must be accepted

as true for the purpose of ruling on that motion, some statements are so conclusory as to come

within an exception to that rule."  *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *see also*

*Dist. Intown Props. Ltd. P'ship v. District of Columbia*, 198 F.3d 874, 878 (D.C. Cir. 1999)

("[T]he court must assume the truth of all statements proffered by the non-movant except for

conclusory allegations lacking any factual basis in the record.").  The plaintiff "must support

[her] allegations . . . with facts in the record; a mere unsubstantiated allegation . . . creates no

'genuine issue of fact' and will not withstand summary judgment."  *Harding v. Gray*, 9 F.3d 150,

154 (D.C. Cir. 1993) (quoting *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53).  On summary

judgment, the Court views all evidence "in the light most favorable to the nonmoving party and

the [C]ourt [ ] draw[s] all reasonable inferences in favor of the nonmoving party."  *Talavera v.*

*Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).  In short, "[t]he inquiry performed is the threshold

inquiry of determining whether there is the need for a trial" because the case turns on material

disputes of fact that could be "resolved in favor of either party."  *Anderson*, 477 U.S. at 250.

## IV.  ANALYSIS

To begin with, the Court addresses Plaintiff's arguments that summary judgment is

unwarranted because (1) the Agency's summary judgment motion is untimely and (2) the record

in this case is incomplete.  *See* Pl.'s Opp'n at 1.  These arguments are meritless.

First, under Federal Rule of Civil Procedure 56(b), "[u]nless a different time is set by

local rule or the court orders otherwise, a party may file a motion for summary judgment at any

time until 30 days after the close of all discovery." *See* Fed. R. Civ. P. 56(b).  Accordingly, the Court has authority to set the time by which a defendant must move for summary judgment.  *Id.*

On November 17, 2023, the Court ordered that the Agency's motion for summary judgment should be filed by January 19, 2024.  *See* Min. Order (Nov. 17, 2023).  On January 19, 2024, and February 1, 2024, the Agency moved for extensions of time to file its motion for summary judgment.  *See* Second Mot. Extension of Time, ECF No. 55; Suppl. Mot. Extension of Time, ECF No. 57.  Although the Court did not immediately rule on either of these motions, on February 8, 2024, the Court granted the Agency's supplemental motion for extension of time *nunc pro tunc* for good cause shown and deemed the Agency's motion for summary judgment timely filed.  *See* Min. Order (Feb. 8, 2024).  Because the Court "granted [the Agency's] motion for extension of time *nunc pro tunc*, . . . [the Agency's] motion for summary judgment was not, in fact, untimely."  *Wada v. Tomlinson*, 517 F. Supp. 2d 148, 181–182 (D.D.C. 2007), *aff'd*, 296 F. App'x 77 (D.C. Cir. 2008).

Second, Tarquinii argues that granting summary judgment would be inappropriate because the "record is incomplete."  *See* Pl.'s Opp'n at 2.  Tarquinii asserts that the Agency has failed to comply with its discovery obligations and the Court's Orders compelling certain items of discovery.  *See id.* at 1–3.  Specifically, Tarquinii says that "Defendant's discovery responses remain deficient, as specified in Plaintiff's Third Report on Defendant's Deficient Supplemental Response, filed on July 17, 2023."  *See id.* at 2.

Tarquinii's argument fails because the Court has already resolved the discovery issues that she raised in her "Third Report on Defendant's Deficient Supplemental Response."  On September 14, 2023, the Court issued an Order and a Memorandum Opinion, granting in part and denying in part Tarquinii's motion to compel.  *See Tarquinii v. Del Toro*, No. 21-cv-1567, 2023

WL 5973992, at *8 (D.D.C. Sept. 14, 2023).  Tarquinii has not pointed to any other relevant

discovery that remains outstanding.  *See generally* Pl.'s Opp'n.  Because Tarquinii has not

indicated what other information she believes is missing, her contention that the record in this

case is incomplete is unpersuasive.  *See Carroll v. Fremont Inv. & Loan*, 636 F. Supp. 2d 41, 47

(D.D.C. 2009) ("Where 'plaintiffs' papers fail to identify any facts essential to opposing [a

motion for summary judgment] as to which discovery is needed,' . . . summary judgment may be

appropriate." (quoting *Curtin v. United Airlines, Inc.,* 275 F.3d 88, 91 (D.C.Cir.2001))).

Additionally, under Federal Rule of Civil Procedure 56(d), the Court is not required to

deny summary judgment merely because the record is not complete to a plaintiff's satisfaction.

*See* Fed. R. Civ. P. 56(d) ("If a nonmovant shows by affidavit or declaration that, for specified

reasons, it cannot present facts essential to justify its opposition, the court *may*: (1) defer

considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take

discovery; or (3) issue any other appropriate order." (emphasis added)); *see also U.S. ex rel.

Folliard v. Gov't Acquisitions, Inc.*, 880 F. Supp. 2d 36, 43 (D.D.C. 2012), *aff'd*, 764 F.3d 19

(D.C. Cir. 2014) ("The district court has the discretion to decide whether circumstances of the

case warrant additional discovery.").  Accordingly, the Court will not deny summary judgment

based on Tarquinii's assertion that the record is incomplete.

Tarquinii also contends that there exists a genuine dispute of material fact.  *See* Pl.'s

Opp'n at 4.  Although Tarquinii's opposition brief merely lists out facts—many of them

unsupported by the record—without any supporting argument or case citation, "a motion for

summary judgment cannot be 'conceded' for want of opposition," *Winston & Strawn, LLP v.

McLean*, 843 F.3d 503, 505 (D.C. Cir. 2016), and the "Court 'must always determine for itself

whether the record and any undisputed material facts justify granting summary judgment,'" *id.*

Accordingly, the Court addresses each of Tarquinii's claims to assess whether there exists a genuine dispute of material fact and whether or not the Agency is entitled to summary judgment.

### A.  Reasonable Accommodation

The Court begins with Tarquinii's claim that the Agency denied her a reasonable accommodation in violation of the Rehabilitation Act.  *See* Compl. at 1.  While employed by the Agency, Tarquinii twice asked for a reasonable accommodation for her disability.  The first requested accommodation was that Tarquinii be allowed work flexibility, including some remote work, for a period of two months.  *See* Def.'s MSJ, Ex. 14 at 2, ECF No. 60-17.  The second requested accommodation was that her flexible work accommodation be extended from two months to a year.  *See id.*, Ex. 15 at 2–3, ECF No. 60-18.  The Agency argues that Tarquinii's claims involving the Agency's denial of her reasonable accommodations must fail because those claims were not administratively exhausted.  *See* Def.'s MSJ at 19–21.  In the alternative, the Agency also argues that Tarquinii's reasonable accommodation claims also fail on the merits. *See id.* at 21–24.

The Court starts with the exhaustion requirement.  The Rehabilitation Act "limits judicial review to employees 'aggrieved by the final disposition' of their administrative 'complaint'[.]" *Spinelli v. Goss*, 446 F.3d 159, 162 (D.C. Cir. 2006) (quoting 29 U.S.C. § 794a(a)(1)).  Thus, an individual suing under the Rehabilitation Act must "exhaust [his] administrative remedies before [he] can file suit to enforce the Act's protections."  *Doak v. Johnson*, 798 F.3d 1096, 1099 (D.C. Cir. 2015).  Because administrative exhaustion is mandated by the Rehabilitation Act, "a court cannot excuse it."  *Avocados Plus Inc. v. Veneman*, 370 F.3d 1243, 1247 (D.C. Cir. 2004); *see also Porter v. Sebelius*, 944 F. Supp. 2d 65, 68 (D.D.C. 2013) ("[U]nlike Title VII claims,

exhaustion of administrative remedies is a jurisdictional requirement for Rehabilitation Act claims.").

Here, the record indicates that Tarquinii did not raise a reasonable accommodation claim in either her initial formal EEO complaint or her amended EEO complaint.  *See* Def.'s MSJ, Ex. 1 at 6, ECF No. 60-4; Def.'s MSJ, Ex. 27 at 2, ECF No. 60-30.  As the Agency has pointed out, although Tarquinii's formal EEO complaints discuss her request for a reasonable accommodation, her EEO complaints explicitly state that "[a]lthough I have provided facts relating to other personnel actions, I provide these facts *for background only*."  *Id.,* Ex. 1 at 6, ECF No. 60-4 (emphasis added); *id.*, Ex. 27 at 2, ECF No. 60-30.  And Tarquinii's EEO complaints list out the particular claims that she intended to raise but do not include a claim for failure to provide a reasonable accommodation.  *See id.*, Ex. 1 at 6, ECF No. 60-4; *id.*, Ex. 27 at 2, ECF No. 60-30.

"The purpose of the exhaustion requirement is to afford the agency an opportunity to fully investigate and resolve an employee's claim."  *Vance v. O'Rourke*, No. 18-cv-00577, 2019 WL 914010, at *6 (D.D.C. Feb. 22, 2019).  The fact that Tarquinii specifically disclaimed bringing a claim based on the "background" facts in her EEO complaints and also listed out the specific claims she intended to raise in her formal EEO complaints leads the Court to believe that the Agency did not have an opportunity to investigate Tarquinii's failure to accommodate claims. *See id.* ("[T]he allegations in the administrative complaint therefore must be specific enough to give federal agencies an opportunity to handle matters internally whenever possible." (quotation marks and citation omitted)); *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) ("The administrative charge requirement serves the important purposes of giving the charged party notice of the claim and narrowing the issues for prompt adjudication and decision" and "[a] court

cannot allow liberal interpretation of an administrative charge to permit a litigant to bypass the Title VII administrative process." (cleaned up)).  And the fact that Tarquinii took the opportunity to amend her formal EEO complaint on multiple occasions but nevertheless chose not to include a claim for failure to accommodate, *see* Def.'s MSJ, Ex. 27 at 2, ECF No. 60-30, supports the Agency's argument that her EEO complaints did not raise a failure to accommodate claim. Moreover, this is not a situation in which a *pro se* plaintiff attempted to raise a claim but failed to do so due to unfamiliarity with the EEOC process; Tarquinii was represented by counsel when she filed her formal EEO complaint.  *See id.*, Ex. 1 at 3.

Because Tarquinii did not raise a failure to accommodate claim at the agency level, her failure to accommodate claims are unexhausted.  There is no genuine dispute of material fact with respect to this issue and the Agency is entitled to summary judgment on Tarquinii's claims based on the Agency's failure to provide a reasonable accommodation.  The Court next turns to Tarquinii's discrimination and retaliation claims.

## B. Discrimination & Retaliation

Tarquinii brings claims for discrimination based on her race, sex, and religion, under Title VII, and based on her disability under the Rehabilitation Act.  *See* Compl. at 1.  Tarquinii also brings claims for retaliation under both Title VII and the Rehabilitation Act.  *See id.*

### 1. Legal Standards for Title VII and Rehabilitation Act Violations

#### a. Title VII

Title VII of the Civil Rights Act makes it unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–2(a)(1).  "This statutory text establishes two

elements for an employment discrimination case: (i) the plaintiff suffered an adverse employment action (ii) because of the employee's race, color, religion, sex, or national origin." *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008).

"Under Title VII, it is [also] unlawful for an employer to discriminate against any of its employees . . . because she has made a charge . . . or participated in any manner in an investigation of discrimination." *Taylor v. Solis*, 571 F.3d 1313, 1320 (D.C. Cir. 2009).  "In order to prevail upon a claim of unlawful retaliation, an employee must show she engaged in protected activity, as a consequence of which her employer took a materially adverse action against her." *Id.* (quotation marks and citation omitted).  Reporting discrimination is a protected activity.  *See Barry v. U.S. Capitol Guide Bd.*, 636 F. Supp. 2d 95, 105 (D.D.C. 2009) (citing to a case that held that an "employee participated in protected activity when the *employee* 'reported discrimination in response to the enquiries . . . [of her employer]'[.]" (quoting *Crawford,* --- U.S. at ---, 129 S.Ct. at 852–53)).

"Where, as here, the record contains no direct evidence that the adverse employment action of which the plaintiff complains was caused by prohibited discrimination, we turn to the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973), to analyze the claim." *Jackson v. Gonzales*, 496 F.3d 703, 706 (D.C. Cir. 2007) (quotation marks and citation omitted).  As with discrimination claims, where "a plaintiff offers only circumstantial evidence of retaliation, her claim is governed by the burden-shifting framework of [*McDonnell Douglas*]."  *Solomon v. Vilsack*, 763 F.3d 1, 14 (D.C. Cir. 2014).

### b.  Rehabilitation Act

Under the Rehabilitation Act, the framework for assessing disability discrimination claims is akin to assessing Title VII discrimination claims: "the two essential elements of a

discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's . . . disability." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008). Retaliation is also unlawful under the Rehabilitation Act. *See Solomon*, 763 F.3d at 14–16.

"A materially adverse action is one that could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Taylor*, 571 F.3d at 1320. (quotation marks and citation omitted). Proving an adverse employment action is generally simple; indeed, there is often "no dispute" about it. *See Baloch*, 550 F.3d at 1196 ("In most employment discrimination cases that reach federal court, there is no dispute that the employee has suffered an adverse employment action, and the sole question is whether the action occurred because of discrimination."). When a plaintiff alleges that she has been discriminated or retaliated against, she must also demonstrate causation which she may prove in either of two ways. "First, a plaintiff may show causation through direct evidence. That is, [s]he may submit evidence that, 'if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption.'" *Newman v. Howard Univ. Sch. of L.*, --- F. Supp. 3d ---, 2024 WL 450245, *9 (D.D.C. 2024) (quoting *Randle v. LaSalle Telecomms., Inc.*, 876 F.2d 563, 569 (7th Cir. 1989). "But [s]he may also show causation through indirect, or circumstantial, evidence." *Id.* at *10. When assessing indirect circumstantial evidence of discrimination, the Court applies "the framework set out . . . in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Id.* (cleaned up). Thus, the *McDonnell Douglas* framework is utilized for both Title VII claims and Rehabilitation Act claims.

### *c.* McDonnell Douglas *Framework*

The *McDonnell Douglas* framework first requires the plaintiff to establish a prima facie case of discrimination. *See Mawakana v. Bd. of Trustees of Univ. of the D.C.*, 926 F.3d 859, 866

(D.C. Cir. 2019).  If the plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant employer to "proffer a legitimate, nondiscriminatory reason for the challenged adverse employment action."  *Id.*  "If the defendant satisfies that burden, the *McDonnell Douglas* framework—with its presumptions and burdens—disappears, and the sole remaining issue is discrimination *vel non*."  *Jackson*, 496 F.3d at 707 (quotation marks and citation omitted); *Brady*, 520 F.3d at 494 (explaining that if the defendant offers a "legitimate, nondiscriminatory reason" for its conduct, the Court "need not—and should not—decide whether the plaintiff actually made out a prima facie case" but "[r]ather, in considering an employer's motion for summary judgment . . . in those circumstances, the district court must resolve one central question: has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?").  At that point, the plaintiff can survive summary judgment only by showing "that a reasonable jury could conclude that [she] was terminated for a discriminatory reason."  *Jackson*, 496 F.3d at 707. (quotation marks and citation omitted); *Brady*, 520 F.3d at 494.  To make such a showing, the plaintiff must prove that a reasonable jury could infer that the employer's given explanation was pretextual and that this pretext shielded discriminatory motives.  *See Newman*, 2024 WL 450245, at *9–10 (finding that in discrimination claims, "the plaintiff must show that the harm that befell [her] was *because of* [her protected classification]" and that the plaintiff can show this through direct or indirect evidence.)

To "support an inference that the employer's stated reasons were pretextual, and the real reasons were prohibited discrimination or retaliation," a plaintiff can rely on a variety of evidence, including "the employer's better treatment of similarly situated employees outside the

plaintiff's protected group, its inconsistent or dishonest explanations, its deviation from established procedures or criteria, or the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff, or other relevant evidence that a jury could reasonably conclude evinces an illicit motive." *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015).

The *McDonnell Douglas* framework works similarly for retaliation claims as it does for discrimination claims. "Under this framework, a plaintiff must first establish the prima facie elements: that he or she engaged in a protected activity, that he[] or she was subjected to an adverse action by the employer, and that there was a causal link between the two." *See Geter v. United States Gov't Publ'g Off.*, 436 F. Supp. 3d 227, 236 (D.D.C. 2020), *aff'd*, No. 20-5043, 2023 WL 4743009 (D.C. Cir. July 25, 2023). "If a plaintiff makes such a showing, then the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for its decision." *Id.* "Once the employer has done so, 'the central question at the summary judgment stage becomes whether the employee has "produced sufficient evidence for a reasonable jury to find that the employer's asserted non-retaliatory reason was not the actual reason" and that the employer fired the employee as retaliation.'" *Id.* at 236–237 (quoting *Johnson v. Interstate Mgmt. Co., LLC*, 849 F.3d 1093, 1099 (D.C. Cir. 2017); *Hernandez v. Pritzker*, 741 F.3d 129, 133 (D.C. Cir. 2013)).

Accordingly, for both Tarquinii's Title VII and Rehabilitation Act claims, the Court must assess whether the Agency offered nondiscriminatory and nonretaliatory reasons for its conduct, and whether Tarquinii could prove to a reasonable jury that the Agency's explanations are pretextual and that a discriminatory or retaliatory motive animated the Agency's employment

17

actions.  The Court discusses this analysis with respect to each of the Agency's employment actions below.

## 2.  The Agency's Employment Actions

### a.  Termination

Tarquinii asserts that she was issued a notice of proposed termination and then got terminated because of her protected classifications and as retaliation for protected activity.  *See* Compl. at 1.  The Agency argues that Tarquinii was terminated based on the findings of an Inspector General investigation into Tarquinii's misconduct.  *See* Def.'s MSJ at 26 ("Plaintiff's misconduct led to her eventual discharge from federal employment.").  Under the *McDonnell Douglas* framework, if a defendant offers a "legitimate, nondiscriminatory reason" for its conduct, the Court "need not—and should not—decide whether the plaintiff actually made out a prima facie case."  *Brady*, 520 F.3d at 494.  Accordingly, the Court begins by assessing whether the Agency has offered a legitimate nondiscriminatory and nonretaliatory reason for terminating Tarquinii.

The Agency argues that it terminated Tarquinii after an investigator from the Office of the Inspector General found that Tarquinii engaged in misconduct and Tarquinii's supervisors agreed with that conclusion.  *See* Def.'s MSJ at 25–28.  The administrative record reveals that the Inspector General investigation into Tarquinii began after Amanda Sheldon, an HR employee at Community Services in Iwakuni Japan—who was not one of Tarquinii's two supervisors— submitted a complaint that Tarquinii was "continuously involved in multiple cases of egregious nepotism and abuse of authority" to "create and maintain employment opportunities . . . for [her] family members."  *See id.*, Ex. 16 at 5–14, ECF No. 63-8.  Although the Court will not detail all of the many allegations in the complaint submitted to the Inspector General, suffice it to say that

the complainant's allegations of nepotism and the appearance of impropriety were detailed and did not appear to be based on any of Tarquinii's protected classifications or on retaliation. *Id.* at 6–14, 18–19, 22. After receiving these complaints of nepotism, the Inspector General ordered an investigation into the allegations of misconduct. *See id.* at 23.

Next, the record reflects that the Inspector General investigation itself was not conducted with any discriminatory or retaliatory animus. The assigned investigator—who was outside Tarquinii's chain of command—appears to have conducted a neutral and thorough investigation into the allegations of Tarquinii's misconduct. *See* Def.'s MSJ, Ex. 1 at 150–167, ECF No. 63-2. And there is no dispute that the investigator conducted his investigation because of allegations of misconduct and not for discriminatory or retaliatory reasons and that the investigator did not himself have any discriminatory or retaliatory animus. *See* Def.'s Reply, at 32, 38, ECF No. 71-1. Without reiterating each of the investigator's findings, the Court observes that the investigator meticulously assessed each of the allegations made against Tarquinii and determined whether those allegations were substantiated by evidence he had discovered. *See id.* Of particular note, the investigator concluded that as the Chief of HR, Tarquinii "improperly advocated for the hiring of her husband," "participated in the hiring of her husband," "improperly advocated for the hiring of her brother," and "improperly used her official capacity to participate in the hiring of her brother." Def.'s MSJ, Ex. 1 at 160–65, ECF No. 63-2. The investigator provided ample support for his conclusions and those conclusions were confirmed by other reviewing staff who agreed that "the preponderance of the evidence" supplied by the investigator in his report "supports the conclusions of this investigation." *See* Def.'s MSJ, Ex. 16 at 4, ECF No. 63-8.

The record shows that Tarquinii's first-line supervisor, Johnston, then issued Tarquinii a notice of proposed termination after reading the Inspector General's report on Tarquinii's

19

misconduct.  *See* Def.'s MSJ, Ex. 4 at 5, ECF No. 60-7.  Johnston's declaration explained that he

had issued the proposal of termination because Tarquinii "was improperly involved in the hiring

of her husband and brother" and "failed to recuse herself involving any hiring of her relatives."

*Id.*  Johnston additionally explained that "the case that [Tarquinii] was overwhelmingly involved

in the hiring of her husband and brother" led to his conclusion that Tarquinii "failed to conduct

herself in a professional manner consistent with being the head of Human Resources and an

executive with the organization."  *Id.*  And he explained that he relied on the Inspector General

investigation when making the decision to remove Tarquinii.  *Id.*

    After reviewing the proposal of termination, Tarquinii's second-line supervisor, Iwaniec,

concluded that the evidentiary record supported "a reasonable conclusion that [Plaintiff] engaged

in a pattern of misconduct that violated the rules prohibiting nepotism and actual or apparent

conflicts of interest."  *See id.*, Ex. 1 at 39, ECF No. 60-4.  Iwaniec reviewed both Johnston's

proposal of termination as well as Tarquinii's response to that proposal and concluded that:

> The evidence substantiates repeated instances in which [Plaintiff] violated one or
> both of these standards in the actions that [Plaintiff] took in connection with the
> employment of [Plaintiff's] husband and brother by [Community Services]. As
> the Chief of Human Resources and the representative of [Community Services]
> on all matters related to civilian personnel management to the command,
> employees and the general public, [Plaintiff's] actions should be a role model for
> others, not an example of misconduct that must be avoided. . . . As a result of
> [Plaintiff's] misconduct, [Plaintiff] seriously breached Marine Corps standards of
> trust and integrity with [Community Services], as well as federal law, regulation
> and policy.

*Id.* at 39–40.  The Agency has thus offered ample evidence to support its detailed explanation

that the investigation into Tarquinii, the proposal of termination, and eventual termination were

conducted for legitimate, nondiscriminatory and nonretaliatory reasons.  *See Brady*, 520 F.3d at

494.  Indeed, Tarquinii says that her "removal action was solely based on the OIG

. . . Investigative report."  *See* Pl.'s Opp'n ¶ 131, ECF No. 65.  Because the Agency has offered a

legitimate, nondiscriminatory, and nonretaliatory reason for these actions, the Court is left to determine whether a reasonable jury could find that the Agency's explanation is pretextual and that discrimination or retaliation was the real reason for the Agency's conduct.

Tarquinii has not pointed to any evidence in the record that could lead a reasonable jury to believe that the Agency's reason for terminating her was pretextual.  Tarquinii first points to procedural irregularities for the proposition that the Agency's reason is pretextual.  While a "deviation from established procedures or criteria *could* be used to convince a jury that an illicit motive animated an employer's conduct, *Walker*, 798 F.3d at 1092, more than a scintilla of evidence is necessary to survive summary judgment, *see Anderson*, 477 U.S. at 249, 252.

Tarquinii argues that when she was issued the notice of proposed termination, she was not given a copy of the Inspector General report or afforded sufficient time to review the proposal and report, and that the proposal did not sufficiently explain why she should be terminated.  *See* Pl.'s Opp'n ¶¶ 139–144.  However, the record indicates—including in Tarquinii's own declaration—that Tarquinii did in fact have an opportunity to read the Inspector General report.  *See id.*, Ex. 2 ¶ 370, ECF No. 65-2 ("On November 13, 2015, I went to Lt. Col. Manning's office to review the IG investigation report."); *see also id.*, Ex. 22 at 3, ECF No. 65-25 ("I've read the report.").  Tarquinii's assertion is therefore unsupported because the record reflects that she did have an opportunity to read the Inspector General report seven days before she submitted her letter in response to the proposal of termination.  *See id.*, Ex. 2 ¶ 370, ECF No. 65-2 (explaining that Tarquinii read the report on November 13, 2015); *see* Def.'s MSJ, Ex. 1 at 39, ECF No. 60-4 (indicating Tarquinii's responsive letter was dated November 20, 2015). Additionally, the proposal of termination adequately explained that it was "based on incidents of misconduct" including the finding that Tarquinii used her "official position as the Chief of

Human Resources to direct actions which facilitated the hire of [her] spouse and younger brother." *See id.* at 30.  Moreover, Tarquinii has not pointed to any evidence that the procedure involved in the proposal of termination deviated from the Agency's standard termination procedures.  *See Walker*, 798 F.3d at 1092.

Tarquinii also argues that her second-line supervisor, Iwaniec, gave inconsistent reasons for her termination.  *See* Pl.'s Opp'n ¶¶ 168–174.  In particular, Tarquinii asserts that while Iwaniec relied on the Inspector General report in his termination notice, he separately testified that he terminated her due to poor performance and refusal to accept responsibility for her actions.  *See id.*  But Tarquinii's assertion mischaracterizes Iwaniec's testimony.  When asked in a deposition why he terminated Tarquinii, Iwaniec testified that he did so because of Tarquinii's "interference in the process of hiring her husband and her brother."  *See* Pl.'s Opp'n, Ex. 3 at 15, ECF No. 65-4.[3]  That statement is consistent with the notification of termination that Iwaniec issued to Tarquinii, which stated that Tarquinii "engaged in a pattern of misconduct that violated the rules prohibiting nepotism and actual or apparent conflicts of interest."  *See* Def.'s MSJ, Ex. 1 at 39, ECF No. 60-4.  The fact that Iwaniec mentioned additional deficiencies in Tarquinii's conduct in his testimony does not undermine the Agency's nondiscriminatory reason for terminating Tarquinii: namely, misconduct.

Tarquinii further argues that she should not have been terminated because the Inspector General report was inaccurate and that she did not violate any nepotism policy.  *See* Pl.'s Opp'n ¶¶ 147–167.  Ultimately, however, it is irrelevant whether the Inspector General report was accurate because—so long as Tarquinii's supervisor relied on that report in good faith—the

---

[3] Due to inconsistent page numbering, when referencing documents attached to Plaintiff's opposition brief, the Court uses the page numbers generated by the ECF filing system.

decision to terminate Tarquinii was based on her supervisors' belief that Tarquinii had engaged in misconduct and not because of any of Tarquinii's protected characteristics or as retaliation. *See Davis v. George Washington Univ.*, 26 F. Supp. 3d 103, 119 (D.D.C. 2014) ("It is important to note that even if a court believes that the employer made a poor personnel decision, the court may not second-guess that decision absent demonstrably discriminatory motive."); *George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005) ("[A]n employer's action may be justified by a reasonable belief in the validity of the reason given even though that reason may turn out to be false.").[4]  In *Brady*, the D.C. Circuit specifically held that an employer's proffered reason for demoting an employee—that the employee engaged in sexually explicit conduct—was not a pretext for race discrimination, regardless of whether the incident had not actually occurred, because the employer honestly and reasonably believed that incident had occurred, given three other employees' accounts of it, followed by thorough and independent investigation that confirmed its probability.  *Brady*, 520 F.3d at 496.  Like in *Brady*, the Agency employer here has presented evidence that it believed Tarquinii engaged in misconduct and that it based its decision on that misconduct.  But the Agency's proffered reason here is even stronger than in *Brady* because, unlike in *Brady* where the plaintiff had alleged the investigation was tainted by racism; here, Tarquinii appears to concede that the investigation was not conducted for discriminatory reasons.  Therefore, whether or not Tarquinii actually engaged in misconduct is beside the point, so long as the Agency made its decision based on the investigation and not for discriminatory or retaliatory reasons.

---

[4] The Court observes that even Tarquinii seems to admit that her termination "was solely based on the [Office of Inspector General] Investigative report."  *See* Pl.'s Opp'n ¶ 131.  *See Davis v. Gables Residential/H.G. Smithy*, 525 F. Supp. 2d 87, 91 (D.D.C. 2007) (granting summary judgment in Title VII retaliation case where "[p]laintiff admit[ted] that [d]efendant had a legitimate, non-retaliatory reason for terminating him").

Tarquinii also alleges that her supervisor previously made sexually and religiously inappropriate remarks toward her, thereby showing that her termination was based on her protected characteristics.  While a supervisor's inappropriate remarks can be evidence of discrimination, isolated remarks are not sufficient, "without more, [to] permit a jury to infer discrimination."  *See Said v. Nat'l R.R. Passenger Corp.*, 317 F. Supp. 3d 304, 323 (D.D.C. 2018), *aff'd*, 815 F. App'x 561 (D.C. Cir. 2020); *Morris v. McCarthy*, 825 F.3d 658, 670–72 (D.C. Cir. 2016) (describing cases where stray remarks were insufficient to create a jury question and distinguishing cases where racially charged statements were "pervasive[ ], sever[e]," or where the speaker played a significant role in the adverse action); *see also Simms v. U.S. Gov't Printing Off.*, 87 F. Supp. 2d 7, 9 n.2 (D.D.C. 2000) ("[E]ven [remarks] made by a supervisor, are insufficient to create a triable issue of discrimination where . . . they are unrelated to an employment decision involving the plaintiff.").

Here, the isolated comments appear to have been made a significant amount of time before Tarquinii's termination and the remarks appear to have no connection with Tarquinii's termination.  *Said*, 317 F. Supp. 3d at 323–24 ("[T]o establish discrimination based on a stray workplace remark, a plaintiff must generally show a clear nexus between the . . . remark and the termination." (cleaned up)); *Sebunya v. Mayorkas*, No. 21-cv-780, 2024 WL 1076809, at *11 (D.D.C. Mar. 8, 2024) ("An allegedly racist remark [by a supervisor] is more likely to provide an inference of discrimination when made around the time of the decision and in reference to the adverse employment action." (quotation marks and citation omitted)); *Hampton v. Vilsack*, 760 F. Supp. 2d 38, 51 (D.D.C. 2011), *aff'd*, 685 F.3d 1096 (D.C. Cir. 2012) (explaining that "racially-tinged remarks" that "occurred more than a year before," and which "had no relation to any alleged misconduct by plaintiff" did not "automatically taint any and all actions taken by

[plaintiff's supervisor] from that date forward"). Tarquinii alleges that Iwaniec made religiously inappropriate remarks approximately a year before her termination. *See* Def.'s Reply ¶¶ 4–6, 8, ECF No. 71-1. However, those statements are temporally attenuated from and appear to have no connection with her termination. *See, e.g.*, *Talley v. Neilsen*, No. 14-cv-1313 (RJL), 2019 WL 635271, at *8 (D.D.C. Feb. 13, 2019) (concluding that discriminatory statements made six months from non-selection were too temporally attenuated to find "a sufficient relationship to the relevant adverse action"). Tarquinii also alleges that Johnston and Iwaniec "forced [her] to apologize to [other employees], while no other male MCCS, Caucasian, employees were required to do the same" and told her to "appear soft spoken." *See* Pl.'s Opp'n ¶¶ 3, 27. But Tarquinii does not explain when this occurred during her tenure at Community Services or how making her apologize and telling her to appear soft spoken was connected to her termination. *See Talley*, 2019 WL 635271, at *8 (explaining that remarks evincing discriminatory animus must have a nexus with the employment decision and that remarks that are temporally attenuated may lack nexus).

Moreover, Tarquinii concedes that Iwaniec and Johnston "based" her "removal" on the Office of Inspector General's investigation report. *See* Pl.'s Opp'n ¶ 130. Although Iwaniec and Johnston ultimately terminated Tarquinii's employment, the record reflects that they did not initiate the investigation and, ultimately, merely agreed with the investigator's findings and removed her for that reason. Even if Iwaniec and Johnston "had a racial or religious animus," that is "not sufficient, because there is no 'nexus between the racial animus and the employment decision'" given that Tarquinii's supervisors terminated her due to the investigation report. *Khan v. Holder*, 37 F. Supp. 3d 213, 230 (D.D.C. 2014); *see also Elliott v. Acosta*, 291 F. Supp. 3d 50, 61 (D.D.C. 2018) (holding that plaintiff failed to identify any genuine dispute of material

fact when plaintiff pointed to isolated race-based remarks made by hiring authority); *cf.*
*Hampton*, 760 F. Supp. 2d at 51 (holding that "no reasonable jury could conclude that [a
supervisor's] decision to at least investigate such serious charges of wrongdoing was so
unreasonable as to itself suggest pretext for discrimination").  Given that Tarquinii acknowledges
that she was terminated because of the investigation report, the Court can see no nexus between
the remarks that Tarquinii alleges her supervisors made and her termination.  Even viewing the
evidence in the light most favorable to Tarquinii, the Court concludes that a reasonable jury
could not find those comments sufficient to rebut the Agency's nondiscriminatory reason for
terminating Tarquinii.

        For similar reasons, the Court concludes that Tarquinii does not present sufficient
evidence of retaliation to overcome the Agency's proffered non-retaliatory reason for
terminating her.  In theory, retaliatory animus against Tarquinii could stem from either informal
complaints that Tarquinii made or from her alleged rejection of sexual advances made by
Iwaniec.  For instance, Tarquinii states that Iwaniec made sexually suggestive remarks toward
her, which she rebuffed and reported.  *See* Pl.'s Opp'n ¶¶ 15–26.  Tarquinii does not provide a
time frame for many of Iwanice's comments, but the latest of Tarquinii's alleged rebuffs and
reporting on Iwaniec's conduct appear to have been made approximately seven months before
her termination, which is a "significant lapse in time."  *Talley*, 2019 WL 635271, at *8 (holding
that six months between a comment and an action was a significant lapse in time and undermined
the nexus between the comment and the employment action); *see* Def.'s Reply ¶¶ 15–26.
Actions that took place more than half a year before her termination, if not longer, are less
probative of retaliation than incidents that are more proximal to the adverse employment action.

Moreover, as explained above, Tarquinii has not explained how any of these alleged incidents has a connection to the Investigation Report substantiating her misconduct and which drove her supervisors' decision to terminate her.  Neither Iwaniec or Johnston initiated the investigation into Tarquinii's misconduct and they both explained the reason for her termination was their agreement with the independent investigator's report.  Tarquinii too agrees that she was terminated because of the investigation report's findings.  Accordingly, Tarquinii has not presented sufficient evidence to overcome the Agency's proffered non-retaliatory reason for terminating her.  *See Brady*, 520 F.3d at 496 (holding that an employer's proffered reason for its adverse employment action was not a pretext for discrimination because employer honestly and reasonably relied on independent investigation that confirmed employee's misconduct); *cf. Hall v. Giant Food, Inc.*, 175 F.3d 1074, 1079–80 (D.C. Cir. 1999) (holding that the supervisor's discriminatory remarks are not considered as evidence of discrimination where the decision to dismiss the employee was made not by the supervisor, but a different individual or department who "made an independent assessment" of challenged conduct).

Lastly, Tarquinii attempts to utilize comparator evidence to show that discrimination and retaliation were the real motivations behind her termination.  *See* Pl.'s Opp'n ¶¶ 193–203.  "Use of comparator evidence is the most commonly employed method of demonstrating that an employer's explanation is pretextual."  *Cienfuegos v. Off. of Architect of the Capitol*, 2015 WL 13653872, at *9 (D.D.C. Apr. 1, 2015) (cleaned up).  To use comparator evidence, a plaintiff must show that her employer treated other employees of a different race, color, religion, or sex (or who did not engage in protected activity) more favorably than the plaintiff in the same factual circumstances.  *See Brady*, 520 F.3d at 495.  But in order "[t]o prove that [s]he is similarly situated to another employee, a plaintiff must demonstrate that [s]he and the allegedly similarly

situated . . . employee were charged with offenses of comparable seriousness." *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015) (cleaned up). "A plaintiff must also demonstrate that all of the relevant aspects of h[er] employment situation were nearly identical to those of the other employee." *Id.* (cleaned up). "Factors that bear on whether someone is an appropriate comparator include the similarity of the plaintiff's and the putative comparator's jobs and job duties, whether they were disciplined by the same supervisor, and, in cases involving discipline, the similarity of their offenses." *Id.* "'Proof of illicit motive is essential,' and the employee 'at all times' has the burden of proving 'that the defendant intentionally discriminated against' her." *Figueroa v. Pompeo*, 923 F.3d 1078, 1086 (D.C. Cir. 2019) (quoting *Segar v. Smith*, 738 F.2d 1249, 1265, 1267 (D.C. Cir. 1984); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

Here, Tarquinii has not shown that the comparator employees were "nearly identical" in all relevant respects in their "employment situation[s]." *Burley*, 801 F.3d at 301; *Burton v. D.C.*, 153 F. Supp. 3d 13, 67 (D.D.C. 2015), *aff'd sub nom. Nelson v. D.C.*, 689 F. App'x 642 (D.C. Cir. 2017) ("At the summary judgment stage, the Court 'must rely on evidence substantiated by the record' to conclude that the plaintiff and an asserted comparator are similarly situated." (citation omitted)); *id.* ("[I]f a reasonable jury would be unable to find that the plaintiff and the comparator were similarly situated, the court may decide, as a matter of law, that the two are not similarly situated . . . ."). Indeed, the record demonstrates that Tarquinii was situated differently from comparator employees. To start, the proposed comparators all engaged in alleged misconduct that was different from the nepotism that Tarquinii was found to have engaged in. Some of the comparators were alleged to have engaged in financial misconduct, *see* Pl.'s Opp'n ¶¶ 193–201, while one of the comparators engaged in an extra-marital affair, *see id.* ¶ 202–203,

and another was terminated for "not being suitable," *see id.* ¶ 197.  Tarquinii has not shown that

these offenses are of comparable seriousness as her alleged misconduct of nepotism.  And as

explained by the administrative judge in this case, "[n]epotism in the civil service is objectively

worse than the general incompetence, negligence, and indiscretion," especially because

"Congress has made it clear that nepotism of any sort has no place in the civil service."  *See*

Administrative Decision, Def.'s MSJ, Ex. 34 at 15, ECF No. 60-37; *see also* 5 U.S.C. § 3110 *et*

*seq.* (prohibiting public officials from "appoint[ing], employ[ing], [and] promot[ing] . . . to a

civilian position in the agency in which he is serving or over which he exercises jurisdiction or

control any individual who is a relative of the public official").  And, in this case, Plaintiff was

found to have engaged in this behavior twice, involving both her husband and her brother.

Furthermore, courts consider whether employees had the same supervisors when

determining whether they are similarly situated.  *Compare Banks v. Perdue*, 298 F. Supp. 3d 94,

104 (D.D.C. 2018) (concluding that two USDA employees were similarly situated in part

because they had the same supervisor) *with White v. Tapella*, 876 F. Supp. 2d 58, 70 (D.D.C.

2012) (discounting comparator police officers assigned to a different supervisors) *and Huckstep*

*v. Washington Metro. Area Transit Auth.*, 216 F. Supp. 3d 69, 80 (D.D.C. 2016) (concluding bus

drivers assigned to different supervisors were not proper comparators).  So far as the Court can

tell, Tarquinii states that Johnston and Iwaniec only had any arguable supervisory responsibility

regarding the discipline of two of her proposed comparators.  Tarquinii says that Iwaniec wrote a

favorable letter of recommendation for Dave Atkins who was "terminated due to not being

suitable," from which the Court may be able to infer that Iwaniec supervised Atkins.  *See* Pl.'s

Opp'n ¶¶ 197.  And Tarquinii says that "Johnston and Iwaniec knew" that an employee named

Tony Taylor "had an extra-marital affair" but that they did not discipline him for doing so.  *See id.* ¶ 202.

First, it is not at all clear from these statements that either Atkins or Taylor was directly supervised by Johnston or Iwaniec.  However, to the extent that either was supervised by Johnston or Iwaniec, the offenses of "not being suitable" and having an extra-marital affair are categorically different types of misconduct than nepotism.  Accordingly, neither Atkins nor Taylor serves as a comparator sufficient to create a genuine dispute of material fact.

Additionally, differences in seniority or role between a plaintiff and a comparator employee undermine a claim that they were similarly situated.  *See Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995).  Here, Tarquinii has not presented evidence showing that she was in a similar role to most of the comparators she identifies.  For instance, Tarquinii does not explain what roles proposed comparators Matthew Niedszeiecki, Jason Gardine, Gary Holsopple, Dave Atkins, Andrew Chung filled at Community Services.  *See* Pl.'s Opp'n ¶¶ 193–203.  While Tarquinii explains that Marty Carter was the Chief of Retail and Services, Richard Courtemanche was the Director of Contracting, Vince Endresen was Chief of Support, and Tony Taylor was a Food Court Manager, she does not explain how any of these positions are comparable to the Chief of Human Resources position that she filled.  She also does not explain how senior those individuals were at Community Services or what level these positions were situated at within the organization.  The "differing roles" of proffered comparator employees presents a "confounding variable" that renders comparison inapposite.  *Burton*, 153 F. Supp. 3d at 67.  Accordingly, Tarquinii has presented insufficient evidence to utilize these individuals as comparators.  While Tarquinii does state that Sue Campbell was a former Chief of Human Resources who was not terminated despite failing to take reports of sexual harassment

seriously, as the Court already explained, Tarquinii does not provide information showing that Tarquinii and Campbell were supervised by the same individuals, she does not explain how her seniority compared with Sue Campbell, and she does not show that failing to take reports of sexual harassment seriously is a comparably serious offense to two separate incidents of nepotism.

Additionally, several of the comparators that Tarquinii points to were, like Tarquinii, also terminated, showing that they were not treated differently from Tarquinii.  *See* Pl.'s Opp'n ¶¶ 193–202.  Tarquinii says that those employees received better termination terms, but the record reflects that Tarquinii was also offered a resignation package in lieu of termination, but she refused to resign and refused any settlement offer from the Agency.  *See* Def.'s MSJ, Ex. 5 at 6, ECF No. 60-8.  Lastly, unlike all of the proposed comparators, Tarquinii was terminated after an independent Inspector General investigation substantiated that Tarquinii engaged in misconduct.  In sum, Tarquinii is both not similarly situated with her proposed comparators and it is not clear that she was treated more harshly than several of those comparators in any event. Accordingly, Tarquinii's comparator evidence does not suffice to show that the Agency's explanations are pretextual.

While it is true that "the degree of similarity" between a plaintiff and her proposed comparators required to show discrimination "may vary in accordance with the size of the potential comparator pool," *Burton*, 153 F.Supp.3d at 67 (quotation marks and citation omitted), here, the Court concludes that even in the aggregate Tarquinii's comparators are insufficient to show discrimination.  "[T]he similarly situated inquiry is not a mechanical comparison," but "requires enough common factors to determine if intentional discrimination was at play" by "eliminating confounding variables, such as differing roles, performance histories, or decision-

making personnel, which helps isolate the critical independent variable: complaints about discrimination." *Id.* (quotation marks and citation omitted).  Here, "confounding variables" abound between Tarquinii and her comparators.  Tarquinii has not explained how any one of the comparators was similarly situated and even if bits of evidence from each of the proposed comparators is taken together, a reasonable jury could not conclude that "discrimination was at play" in Tarquinii's termination.  *Id.*; *see also Montgomery v. Chao*, 546 F.3d 703, 708 (D.C. Cir. 2008) (holding that "a reasonable jury could not have inferred discrimination" where a plaintiff's comparators were not similarly situated).

Additionally, even if a reasonable jury considered in the aggregate all of the evidence that Tarquinii attempts to utilize here—*e.g.*, stray remarks, alleged hostility, and comparators—it could not conclude that she was terminated for discriminatory or retaliatory reasons.  While it is clear that Plaintiff believes Defendant improperly terminated her, she has not pointed to evidence sufficient to show that the Agency's nondiscriminatory and nonretaliatory reason for terminating her—namely, that she twice engaged in the serious misconduct of nepotism, which was substantiated by an independent investigator—was pretextual.  *See Wada v. Tomlinson*, 517 F. Supp. 2d 148, 206 (D.D.C. 2007), *aff'd*, 296 F. App'x 77 (D.C. Cir. 2008) (holding that "[b]ased on the totality of the admissible evidence before the [c]ourt, a jury could not reasonably conclude that Plaintiff's termination constituted impermissible discrimination" because plaintiff did not overcome defendant's proffered reason that it terminated plaintiff because of misconduct).  She has not shown that she was similarly situated to other employees who were disciplined less harshly than her, she has not shown that any remarks made by her supervisors were connected to her termination—especially given that her supervisors did not initiate the independent investigation into her misconduct, which led to her termination—and she has not shown that the

investigation into her misconduct was tainted by discrimination or retaliation.  Accordingly, "[t]he evidence in this case, even considered in the aggregate, would not allow a jury to infer intentional discrimination."  *Thompson v. McDonald*, 169 F. Supp. 3d 170, 199 (D.D.C. 2016); *Anderson*, 477 U.S. at 251 (explaining that at summary judgment, the question is "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it").

Because Tarquinii has not pointed to sufficient evidence that either individually or in the aggregate could convince a reasonable jury that she was terminated for discriminatory or retaliatory reasons—rather than because her supervisors concluded she engaged in misconduct—the Court concludes that the Agency is entitled to summary judgment with respect to Tarquinii's Title VII and Rehabilitation Act claims that hinge on Tarquinii's termination.

### b. Termination Appeals

Tarquinii next raises a claim that she was discriminated and retaliated against when her two termination appeals upheld her termination.  *See* Compl. at 1.  Under the *McDonnell Douglas* framework, the Agency has offered a nondiscriminatory and nonretaliatory reasons for its conduct.  First, the Agency argues that Colonel Boucher—who adjudicated Tarquinii's first-level appeal—reviewed the records related to Tarquinii's termination, including the Inspector General report and the termination notification, and concluded that there existed "substantial evidence to support the conclusion that [Tarquinii] violated rules prohibiting nepotism and actual or apparent conflicts of interest on multiple occasions by the actions [she] took in connection with the employment of [her] husband and [her] brother."  *See* Def.'s MSJ, Ex. 8 at 2–3, ECF No. 60-11.  Thus, the Agency says, Tarquinii's first-level appeal was denied because Colonel Boucher found that Tarquinii had engaged in misconduct, and not for discriminatory or

retaliatory reasons.  *See* Def.'s MSJ at 34–35.  And with respect to Tarquinii's second-level appeal, the Agency points to evidence showing that Director Lacy at Marine Corps Headquarters, considered "all relevant documentation" and agreed that substantial evidence existed "to support [Tarquinii's] termination of employment."  *See* Def.'s MSJ, Ex. 9 at 3, ECF No. 60-12.  Thus, both appeal authorities based their respective decisions on their view that the Inspector General report had found that Tarquinii engaged in misconduct—a nondiscriminatory and nonretaliatory reason to deny Tarquinii's termination appeals.

And to reiterate, Tarquinii has not presented any evidence of discriminatory or retaliatory motive from any of the following: the employee that initiated the misconduct complaint against her, the investigator who investigated the complaint and concluded that she engaged in misconduct, or the two individuals who upheld Tarquinii's termination based on the misconduct. Tarquinii has presented no evidence that either Colonel Boucher or Director Lacy harbored discriminatory or retaliatory animus against her.

Because the Agency has provided a nondiscriminatory and nonretaliatory reason for the denials of Tarquinii's appeals, Tarquinii must show that a jury could find the Agency's reason to be pretextual and that discrimination or retaliation was the real reason for the denial of her appeals in order to survive summary judgment.  *See Brady*, 520 F.3d at 494.  In support of her argument that the denials were discriminatory and retaliatory, Tarquinii points to what she calls irregularities in the appeals process, *see* Pl.'s Opp'n ¶¶ 175–188, but none of these alleged irregularities evinces that her appeal was denied for discriminatory or retaliatory reasons.

First, Tarquinii argues that her supervisors and other parties interfered with the first-level appeals process.  *See id.* ¶ 175.  But Tarquinii points to nothing in the record to support her contention that there was any improper influence or interference in the first-level appeals

process.[5]  It is possible that Tarquinii intends to argue that Colonel Boucher was improperly influenced by Carlos Saldana's interpretation of the regulations governing Community Service's employee's conduct, *see id.* ¶ 176, but there is nothing in the record to indicate that it was procedurally improper for Colonel Boucher to consider the interpretation of HR regulations offered by Saldana, who assisted in the Inspector General Investigation and who was himself an HR professional.  *See id.* ¶¶ 175–188.  Nor does Tarquinii make any claim that Colonel Boucher himself harbored any discriminatory or retaliatory animus.  Ultimately, Colonel Boucher thoroughly explained his reasoning for upholding Tarquinii's termination and there are no indications that there were any improper attempts at influencing or interfering with the appeals process.  *See* Def.'s MSJ, Ex. 8 at 2–3, ECF No. 60-11.

Second, Tarquinii argues that she was not given the opportunity to cross-examine witnesses as required by the Agency's policy manual and that she was not given the chance to review certain pieces of evidence that were provided to Colonel Boucher.  *See* Pl.'s Opp'n ¶¶ 179–185.  But, as the Agency points out, the Agency's policy manual did not, in fact, afford Tarquinii a right to cross-examine witnesses prior to an appeal hearing.  *See* Def.'s MSJ, Ex. 1 at 118, ECF No. 60-4.  Rather, an appealing party is permitted to cross-examine witnesses at the appeal hearing.  *See id.*  And it was Tarquinii's decision to forgo a hearing on appeal where she would have been afforded an opportunity to examine witnesses.  *See id.* at 82, 86.  Moreover,

---

[5] In support of her contention, Tarquinii cites to "Ex 14 at 461," *see* Pl.'s Opp'n Statement ¶ 175, but so far as the Court can determine, Exhibit 14 to Tarquinii's brief in opposition does not contain a page numbered 461.  And the Court has found nothing in the record to support Tarquinii's contention.  Moreover, the Court "is under no obligation to sift through the record, which often contains voluminous deposition transcripts, interrogatory responses, and document productions, in order to evaluate the merits of that party's case." *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 154 (D.C. Cir. 1996).

Tarquinii's contention that she was not given the chance to review certain evidence is rebutted by the record. The record reflects that the Agency provided Tarquinii with all of the evidence it would have presented at the hearing and that it later summarized that evidence—without providing new evidence—in its submission to Colonel Boucher. *See id.* at 82 (explaining that the Agency "provided Mrs. Tarquinii with all of its documentary evidence to be used at the hearing."). Tarquinii also argues that the Agency's submission to Colonel Boucher was filed late, *see* Pl.'s Opp'n ¶ 183, but she does not explain how that late filing shows pretext, especially given that her own filing was also late, *id.* ¶ 184; *see also* Pl.'s Opp'n, Ex. 32 at 2, ECF No. 65-35.

Lastly, Tarquinii argues that the reason Colonel Boucher gave for upholding her termination differed than the reasons given for her termination in her proposal of termination letter. *See* Pl.'s Opp'n ¶ 187. But Colonel Boucher's letter and testimony align with the proposal of termination. *Compare* Def.'s MSJ, Ex. 1 at 30, ECF No. 60-4 (proposal of termination) *with id.*, Ex. 8, ECF No. 60-11 (Boucher decision upholding termination on appeal) *and id.*, Ex. 25 at 88:16-20, ECF No. 60-28 (Boucher Deposition Transcript). In particular, the proposal of termination, the decision on appeal, and Colonel Boucher's later testimony all support that Colonel Boucher upheld Tarquinii's termination because of her misconduct.

Separately, Tarquinii asserts that the denial of her second-level appeal was also discriminatory and retaliatory. *See* Compl. at 1; Pl.'s Opp'n ¶¶ 189–190. Tarquinii argues that she "was not given the opportunity to review or respond" to submissions made by the Agency on the second-level appeal. Pl.'s Opp'n ¶ 189. And she argues that various Department employees directly "influenced and interfered" with the Director Lacy's decision to uphold her termination. *Id.* ¶ 190. These arguments are meritless because Tarquinii has not pointed to any material in the

record showing that Lacy considered any materials that Tarquinii did not have a chance to address.  Similarly, Tarquinii has pointed to no evidence in the record showing that any Department employees influenced or interfered with her second level appeal. Unsupported allegations and conclusory statements are not sufficient to defeat summary judgment.  *See Ass'n of Flight Attendants-CWA*, 564 F.3d at 465–66.  And Tarquinii has not alleged that Lacy herself had discriminatory or retaliatory animus.  *See* Pl.'s Opp'n ¶¶ 189–192.  Because Tarquinii has pointed to no evidence based on which a reasonable jury could find that the Agency's conduct was motivated by a discriminatory or retaliatory motive, the Court grants the Agency summary judgment with respect to Tarquinii's discrimination and retaliation claims based on the denials of her termination appeals.

### c. Interference with Other Employment Opportunities

Tarquinii argues that she was discriminated against and retaliated against when Department employees gave her poor employment references when she applied for positions at other employers.  *See* Compl. at 1.  In particular, Tarquinii alleges that poor references interfered with her employment opportunities at the U.S. Department of Justice, the U.S. Department of the Navy, the U.S. Government Publishing Office, and the U.S. Bureau of Engraving and Printing.  *See* Pl.'s Opp'n ¶¶ 204–212; *see also* Def.'s MSJ, Ex. 27 at 18–19, 21, 23, 26.  The D.C. Circuit has explained that employers are prohibited from sending negative employment references under Title VII if they do so based on a former employee's protected characteristics.  *See Shehadeh v. Chesapeake & Potomac Tel. Co. of Maryland*, 595 F.2d 711, 722 (D.C. Cir. 1978).  However, "not every employment reference though sent maliciously and productive of a devastating impact will engender a grievance cognizable under Title VII.  Only when the practice amounts to disparate treatment on the basis of 'race, color, religion, sex, or national origin' can the statute be

invoked." *Id.*; *see also Cheatham v. Mayorkas*, No. 18-cv-03026, 2021 WL 4148359, at *21 (D.D.C. Sept. 13, 2021) (same).

The Agency has provided evidence that Tarquinii's supervisor's negative (if they can indeed be called negative) employment references were made because her supervisors were justifiably dissatisfied with Tarquinii's performance as an HR professional. *See Barry v. Haaland*, No. 19-cv-3380 (DLF), 2022 WL 4598518, at *7 (D.D.C. Sept. 29, 2022), *aff'd*, No. 22-5268, 2023 WL 2905253 (D.C. Cir. Apr. 10, 2023) ("Dissatisfaction with an employee's performance based on poor performance is a legitimate and non-discriminatory reason for giving a negative job reference."); *see also Simmons v. Cox*, 495 F. Supp. 2d 57, 67 (D.D.C. 2007), *aff'd*, No. 07-5268, 2008 WL 2516463 (D.C. Cir. Feb. 25, 2008) (applying the *McDonnell Douglas* framework and holding that the employer provided non-retaliatory reason for negative employment reference when the employer's reference "reflected his true opinion of plaintiff's work"). In particular, the record supports that Tarquinii's supervisors believed that Tarquinii had engaged in misconduct and refused to give her more positive employment references on that basis. *See*, *e.g.*, Boucher Depo, Def.'s MSJ, Ex. 25 at 4, ECF No. 63-10. Unlike in *Shehadeh* where the Circuit dealt with the "promulgation of untrue accounts" of the plaintiff's conduct, 595 F.2d at 723 n.57, Tarquinii has not pointed to evidence that her supervisors shared references that they believed were untrue; rather, it appears that Tarquinii's supervisors shared information that they credited as true.

Moreover, as reflected by the record, it does not even appear that the Agency's employees made any particularly negative statements about Tarquinii when asked for employment references. For instance, when asked how he responded to questions about Tarquinii from another agency employer, Colonel Boucher testified that he responded "[i]n a

positive manner," but that he would not hire Tarquinii again, though he did not explain why.  *See* Def.'s MSJ, Ex. 25 at 4, ECF No. 63-10.  Additionally, Tarquinii's own opposition brief does not indicate exactly how she believes employees at the Agency interfered with other employment opportunities.  For example, Tarquinii merely alleges that after a potential employer contacted Community Services, her tentative offer of employment was rescinded.  *See* Pl.'s Opp'n ¶ 205–206.  She also says that at one point the Agency told a potential employer that her termination appeal had not yet been decided.  *See id*.  Neither of these assertions supports the notion that individuals at the Agency provided potential employers with untrue information that interfered with her other employment opportunities.  The closest Tarquinii gets to asserting that the Agency made negative remarks in employment references is when she says that Community Services provided inaccurate information to some employers.  *See id.* ¶¶ 209, 211.  But the record citations that Tarquinii points to do not support the proposition that employees at Community Services provided other employers inaccurate information.  *See* Pl.'s Opp'n, Ex. 41, ECF No. 65-44; *id.*, Ex. 14, ECF No. 65-16.

Because the Agency has satisfied its burden of showing a legitimate and non-retaliatory justification for the negative employment reference, "the burden-shifting framework disappears, and a court reviewing summary judgment looks to whether a reasonable jury could infer . . . retaliation from all the evidence."  *Jones*, 557 F.3d at 677 (quotation marks omitted).  As explained above, a supervisor's "truthful assessment of [an employee's] work" is a legitimate non-retaliatory reason to provide a negative employment reference when a third party solicits an assessment of that employee.  *Barry*, 2022 WL 4598518, at *6; *see also Shehadeh*, 595 F.2d. at 723 n.57 (focusing on the fact that references were untrue); *c.f. Matthews v. Wisconsin Energy Corp. Inc.*, 534 F.3d 547, 558–60 (7th Cir. 2008) (explaining that adverse employment action

exists where employer disseminates "*false* reference information" but that sharing "objectively *true*" information does not constitute adverse employment action (quotation marks and citation omitted) (emphasis added)).

At this stage, the Court considers whether Tarquinii can meet her burden to show that the Agency's explanation is merely a pretext for retaliation.  *Brady*, 520 F.3d at 494.  To do so, Tarquinii can point to her "employer's better treatment of similarly situated employees outside the plaintiff's protected group, its inconsistent or dishonest explanations, its deviation from established procedures or criteria, or the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff, or other relevant evidence that a jury could reasonably conclude evinces an illicit motive."  *Walker*, 798 F.3d at 1092.

In arguing that the Agency's reason for giving her allegedly negative employment references was pretextual, Tarquinii points to a comparator employee who she says was given better references.  As explained above, however, the comparator employees that Tarquinii points to are not similarly situated to her.  *See* Part IV.B.2.a, *supra*.  For instance, Tarquinii says that one employee who negligently overcharged the Agency due to negligence was given a "neutral" reference.  *See* Pl.'s Opp'n Statement ¶ 194.  But negligence and nepotism are very different charges of misconduct and Tarquinii has not shown that any of the references that she received could be considered worse than neutral.[6]  Tarquinii also does not show that there were any deviations from established procedures regarding employment references.  *See Walker*, 798 F.3d at 1092.  Accordingly, no reasonable jury could conclude that Tarquinii has made a sufficient

---

[6] Tarquinii had the ability to take discovery from the Agencies to which she applied and at which she was not hired, *see* Tr. of October 13, 2022, Status Conference, ECF No. 34; *see also* Fed. R. Civ. P. 26, but has not presented any evidence that her supervisor's at the Agency provided references that could be considered more than neutral at worst.

showing that alleged negative employment references were made for discriminatory reasons or in retaliation for her protected activity.  Therefore, the Agency is entitled to summary judgment on this aspect of Tarquinii's claim based on interference with other employment opportunities.[7]

### C.  Hostile Work Environment

Tarquinii has raised a claim that the Agency created a hostile work environment.  *See* Compl. at 1.  For a hostile work environment claim, a plaintiff must demonstrate that the "workplace is permeated with 'discriminatory intimidation, ridicule, and insult'" and that this behavior is "'sufficiently severe or pervasive [as] to alter the conditions of the victim's employment and create an abusive working environment.'"  *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993) (citation omitted).  "The Supreme Court has made it clear that 'conduct must be extreme to amount to a change in the terms and conditions of employment.'"  *George v. Leavitt*, 407 F.3d 405, 416 (D.C. Cir. 2005) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).  Accordingly, no violation occurs "if the victim does not subjectively perceive the environment to be abusive" or if the conduct "is not severe or pervasive enough to create an objectively hostile or abusive work environment."  *Harris*, 510 U.S. at 21–22.  "In determining whether an actionable hostile work environment exists, [courts] look to 'all the circumstances,'

---

[7] The Court is unable to determine whether Tarquinii intended to raise a claim for discrimination or retaliation based on a negative performance review given to her by her first-line supervisor, Johnston in 2015, *compare* Compl. (not appearing to raise claims regarding the 2015 performance evaluation) *with* Pl.'s Opp'n Statement at ¶¶ 36–50 (including allegations about her 2015 negative performance evaluation), but to the extent she intended to raise a claim based on that negative performance evaluation, that claim is unexhausted.  "Title VII requires that a person complaining of a violation file an administrative charge with the EEOC and allow the agency time to act on the charge."  *Park*, 71 F.3d at 907.  Because Tarquinii did not raise a discrete claim based on the performance review in either her initial formal EEO Complaint or her subsequent amended formal EEO Complaint, that claim is unexhausted.  *See* Def.'s MSJ, Ex. 1 at 6–7, ECF No. 60-4; *id.*, Ex. 27 at 2–3, ECF No. 60-30.  Because Tarquinii did not exhaust this potential claim—to the extent she raises such a claim—the Agency is entitled to summary judgment with respect to that claim.

including 'the frequency of the discriminatory conduct; its severity; whether it is physically

threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes

with an employee's work performance.'" *Morgan*, 536 U.S. 101 at 116.  These standards

"ensure that Title VII does not become a general civility code" that polices "the ordinary

tribulations of the workplace." *Faragher*, 524 U.S. at 788 (citation and internal quotation marks

omitted).

Plaintiffs must also exhaust their hostile work environment claims.  "To meet the

[exhaustion] requirement, [an] employee must contact an EEO counselor within 45 days of the

alleged discriminatory action in accordance with [EEOC] regulations." *Craig v. Lew*, 109 F.

Supp. 3d 268, 281 (D.D.C. 2015).  A plaintiff must also raise her hostile work environment claim

in her formal EEO complaint, although plaintiffs need not use any "specific 'magic words' in

order to exhaust." *Jimenez v. McAleenan*, 395 F. Supp. 3d 22, 33 (D.D.C. 2019).  But "the

exhaustion requirement on a hostile work environment claim is less stringent than for stand-

alone claims of discrimination and retaliation, [and] a plaintiff need only have filed an

administrative complaint alleging some of the claims that comprise the hostile work environment

claim." *Id.* at 34 (cleaned up).  "Thus, a plaintiff may incorporate non-exhausted allegations into

a hostile work environment claim so long as some allegations were exhausted and all of the

allegations together form one hostile environment claim." *Id.* (cleaned up).  "To form one claim,

the unexhausted allegations must be adequately linked to the exhausted ones—if, for example,

they involve the same type of employment actions, occur relatively frequently, and are

perpetuated by the same managers." *Id.* at 34–35 (cleaned up).  "[T]ypically the plaintiff must

offer at least some suggestion of a hostile work environment such as by referring to an ongoing

pattern of conduct or describing a workplace pervaded by abuse." *Id.* at 33 (cleaned up).

"Courts therefore look to whether a plaintiff described only discrete events in his administrative charge or also patterns of conduct or other characteristics typical of a hostile work environment claim." *Id.*

Here, Tarquinii did not list hostile work environment as one of the claims in her formal EEO complaints despite amending that complaint on multiple occasions. *See* Def.'s MSJ, Ex. 1 at 6; *id.*, Ex. 27 at 2. Furthermore, her formal EEO complaints—which were drafted by a lawyer—disclaimed any claims not explicitly listed. *See* Def.'s MSJ, Ex. 1 at 6; *id.*, Ex. 27 at 2. While plaintiffs are not usually required to explicitly list out a hostile work environment claim in their complaint so long as they refer to some of the conduct composing that claim, *see Jimenez*, 395 F. Supp. 3d at 34, here Tarquinii specifically disclaimed unlisted claims. Given that she disclaimed claims not explicitly listed in her formal EEO charges, "[Tarquinii's formal EEOC] charge's description of discrete events could not . . . be reasonably expected upon investigation to lead to a hostile work environment claim." *Id.* (quoting *Park v. Howard Univ.*, 71 F.3d 904, 908 (D.C. Cir. 1995)). "[F]ar from using the words 'hostile work environment,' [Tarquinii's] EEO complaint[s] do[] not even 'offer at least some suggestion of a hostile work environment in the charge narrative.'" *Id.* (citation omitted); *see also Furey v. Mnuchin*, 334 F. Supp. 3d 148, 159 n.7 (D.D.C. 2018) (concluding that the plaintiff had not exhausted her hostile work environment claim because "[a]lthough plaintiff filed an administrative charge . . . it did not express or even hint at a hostile work environment claim" and "when she amended the complaint to add retaliation claims against her supervisors, she did not include any reference to a hostile work environment"); *Maryland v. Sodexho*, 474 F. Supp. 2d 160, 162 (D.D.C. 2007) (holding that the plaintiff failed to exhaust his hostile work environment claim when he checked only the retaliation box and wrote in the particulars section that he "was terminated in retaliation for filing

a previous EEOC Charge of Discrimination").  Accordingly, the Court concludes that Tarquinii did not raise a hostile work environment claim in her formal EEO complaints, and that her hostile work environment claim is unexhausted.

Tarquinii's hostile work environment claim fails twice over because she has not exhausted that claim for a separate reason.  *See Morgan*, 536 U.S. at 116.  Tarquinii's formal EEO complaint indicates that she initially contacted an EEO counselor on December 16, 2016.  *See* Def.'s MSJ, Ex. 1 at 4, ECF No. 60-4; *see also id.* at 74 (EEO counselor's report reflecting initial EEO contact on December 16, 2016).  Despite the listed date—reflecting that Tarquinii first initiated contact with an EEO counselor in December 16, 2016—based on other dates in the record, the Court believes that the listed date is a typographical error and that Tarquinii meant to indicate an initial contact date of December 16, 2015.  This is so because the date of the EEO counselor's final interview was March 31, 2016 and Tarquinii only filed her formal EEO complaint on April 8, 2016—both dates before December 16, 2016.  *See id.* at 4–5.  Moreover, the final decision regarding Tarquinii's EEOC complaint specifies that Tarquinii "requested [EEO] counseling" on "December 16, 2015."  S*ee id.*, Ex. 35 at 3, ECF No. 60-38.  Accordingly, the record indicates that Tarquinii initiated EEO counseling on December 16, 2015.

Although, Tarquinii does not dispute that she initiated contact with an EEO counselor on December 16, 2015, *see generally* Pl.'s Opp'n, Tarquinii has attached an email to her brief opposing summary judgment that indicates that she contacted an EEO counselor earlier—on November 24, 2015.  *See* Pl.'s Opp'n, Ex. 38, ECF No. 65-41.  As the Agency explains, that email is unauthenticated and was not produced in discovery.  *See* Def.'s Reply at 15.  If a party "fails to provide information" as required by Federal Rule of Civil Procedure 26(e), "the party is not allowed to use that information . . . to supply evidence on a motion . . . unless the failure was

substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1); *see also* LCvR 26.2(a) ("A party that without substantial justification fails to disclose information required by this Rule or by Fed. R. Civ. P. 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Fed. R. Civ. P. 26(e)(2) is not, unless such failure is harmless, permitted to use as evidence . . . on a motion any . . . information not so disclosed.").  "If a party violates its obligation and fails to provide such information, the sanction of preclusion is automatic and mandatory unless the party can show that the failure to disclose was either substantially justified or harmless."  *Stewart v. D.C.*, No. 17-cv-495, 2019 WL 4261067, at *6 (D.D.C. Sept. 9, 2019), *aff'd*, 836 F. App'x 12 (D.C. Cir. 2021) (precluding consideration of exhibits a plaintiff produced for the first time in opposition to a defendant's motion for summary judgment).  The Agency specifically requested that Tarquinii provide information and documentation on when she sought EEO counseling, *see* Def.'s Mot. Seal, Ex. 3 at 8, 12, ECF No. 72–3, and Tarquinii has not explained why she did not produce this email to the Agency.  Additionally, the date indicated in the attached email is directly contradicted by Tarquinii's own EEO complaint and the final EEO decision and Tarquinii does not dispute the December 16, 2015, date in her brief or in her statement of genuinely disputed facts.  *See* Def.'s MSJ, Ex. 1 at 4–5, ECF No. 60-4; *id.*, Ex. 35 at 3, ECF No. 60-38; *see generally* Pl.'s Opp'n.  Accordingly, the Court concludes that there is no genuine dispute with respect to December 16, 2015, as the date Tarquinii initiated contact with an EEO counselor.

Working off of an initial EEO counselor contact date of December 16, 2015, only employment actions that occurred on or after November 1, 2015—*i.e.*, 45 days prior to December 16, 2015—could be timely raised with the EEO counselor.  *See Craig*, 109 F. Supp. 3d at 281; *see also* 29 C.F.R. § 1614.105 ("An aggrieved person must initiate contact with a

Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action.").  But here, the only employment actions that Tarquinii points to after November 1, 2024, are the proposal of termination, her termination, the denial of her termination appeals, and the Agency's alleged interference with her employment with other employers.  Just as allegations of "the removal of important assignments, lowered performance evaluations, and close scrutiny of assignments by management" are not enough to state a hostile work environment claim, *Nurriddin*, 674 F.Supp.2d at 94, none of the actions at issue here are supportive of a hostile work environment claim because none of these actions permeate the workplace with "discriminatory intimidation, ridicule, and insult" such that this behavior would be "sufficiently severe or pervasive [as] to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21 (citation omitted).  Indeed, none of the actions at issue here were intimidating, amounted to ridicule, or insulted Tarquinii.  "Each event that [plaintiff] identifies as an example of abusive conduct fails to add materially to the alleged aura of hostility" because the actions were "sporadic" and "had some legitimate bases."  *Mera v. Garland*, No. 20-cv-2127, 2024 WL 1253856, at *13 (D.D.C. Mar. 25, 2024); *Durant v. D.C. Gov't*, 875 F.3d 685, 700 (D.C. Cir. 2017) (concluding that plaintiff's placement on administrative leave and reprimand letter were "taken not to intimidate, ridicule, or insult" plaintiff, but "to address his deficient work performance," and thus that these actions did not give rise to a hostile work environment (alteration in original accepted)).

While Tarquinii's termination certainly altered the terms of her employment, it did not do so through intimidation or insult as is required for a hostile work environment claim.  *See Hartzler v. Mayorkas*, No. 20-cv-3802, 2022 WL 15419995, at *23 n.10 (D.D.C. Oct. 27, 2022),

*aff'd*, No. 22-5310, 2024 WL 3219489 (D.C. Cir. June 28, 2024) ("Termination itself is not harassing conduct, and while it can be an instance of disparate treatment, it does not create a hostile work environment because it eliminates the existence of a work environment all together." (quotation marks and citation omitted)).  And Tarquinii's allegation that the Agency interfered with new employment opportunities similarly did not alter the terms of Tarquinii's employment because, by that point, she was no longer at her former workplace.  *See Roberts v. Sage Corp.*, No. 320CV365FJSATB, 2021 WL 3617670, at *4 (N.D.N.Y. Aug. 16, 2021) ("It is axiomatic, however, that incidents occurring after a plaintiff's employment has ended cannot contribute to his hostile work environment.") (collecting cases); *Hossain v. McHugh*, No. EP-15-CV-00083-KC, 2015 WL 7162022, at *10 (W.D. Tex. Nov. 13, 2015) ("[A]cts that occur after the term of employment has ended cannot support a claim for hostile work environment") (collecting cases); *Moseley v. Sessions*, No. CV 216-153, 2017 WL 5559923, at *3 (S.D. Ga. Nov. 17, 2017) ("[E]vents supporting a hostile work environment claim cannot arise after the last day of employment.").

Because none of the alleged conduct that occurred after November 1, 2015, contributed to a hostile work environment, Tarquinii cannot "adequately link[]" that conduct to events that occurred earlier in her employment at Community Services.  *Jimenez*, 395 F. Supp. 3d at 34. Moreover, the actions that the Agency took after November 1, 2015, were categorically different from the actions that Tarquinii alleges occurred earlier and therefore do not "involve the same type of employment action" sufficient to connect the events into one hostile environment claim. *Id.* (cleaned up); *see also Vance v. O'Rourke*, No. 18-cv-00577, 2019 WL 914010, at *7 (D.D.C. Feb. 22, 2019) ("[T]he D.C. Circuit has held that untimely and timely discrete acts can be joined together as a single hostile environment 'only if they are adequately linked into a coherent

hostile environment claim—if, for example, they involve the same type of employment actions, occur relatively frequently, *and* are perpetrated by the same managers.'" (emphasis in original) (citation omitted)).  For instance, the earlier actions that Tarquinii points to include inappropriate remarks allegedly made by her second-line supervisor, Iwaniec, whereas the conduct that occurred after November 1, 2015—which was not initiated, investigated, or based on investigatory conclusions reached by Iwaniec—is related to Tarquinii's termination due to findings of misconduct reached by others first.  Accordingly, the Court concludes that Tarquinii's hostile work environment claim is unexhausted, and the Agency is entitled to summary judgment on that claim.[8]

### D.  Due Process

It is unclear from Tarquinii's complaint whether she intends to raise a due process claim. *See* Compl. at 1.  To the extent she does, however, the Court concludes that a due process claim is meritless on this record.  Although Tarquinii does not state explicitly what due process interest the Agency deprived her of, *see generally* Compl.; Pl.'s Opp'n, the Court infers that Tarquinii's claim is based on the termination of her employment.

"[B]oth the substantive and the procedural rights protected by the Due Process Clause require a party to fulfill distinct legal elements."  *Statewide Bonding, Inc. v. U.S. Dep't of Homeland Sec.*, 422 F. Supp. 3d 35, 41 (D.D.C. 2019), *aff'd sub nom. Statewide Bonding, Inc. v.*

---

[8] While equitable tolling may be applied to Title VII claims, tolling is appropriate only where a plaintiff shows that she (1) "has been pursuing h[er] rights diligently, and (2) that some extraordinary circumstance stood in h[er] way and prevented timely filing."  *Menominee Indian Tribe of Wisconsin v. United States*, 577 U.S. 250, 255 (2016).  Tarquinii has not pointed to anything in the record—and the Court has found nothing in the record—to suggest that anything prevented Tarquinii from timely contacting an EEO counselor with respect to her allegations. And indeed, Tarquinii specifically disclaimed raising any claims beyond those listed in her formal EEO complaints, even after twice amending that complaint. *See* Def.'s MSJ, Ex. 27 at 2–3.  Accordingly, equitable tolling is not merited here.

*United States Dep't of Homeland Sec.*, 980 F.3d 109 (D.C. Cir. 2020).  "The substantive component of the Due Process Clause protects fundamental rights, or those that are 'implicit in the concept of ordered liberty.'"  *Kelley v. D.C.*, 893 F. Supp. 2d 115, 123 (D.D.C. 2012).  "Fundamental rights are created only by the Constitution, and enjoy protection against certain government actions, regardless of the fairness of the procedures used to implement them."  *Id.* (cleaned up).  The D.C. Circuit has established that there is no fundamental right to government employment.  *Am. Fed'n of Gov't Emp. v. United States*, 330 F.3d 513, 523 (D.C. Cir. 2003).  Because Tarquinii lacks a fundamental right to her employment, her claim does not enjoy substantive due process protection.  *Id.*

Similarly, a procedural due process claim does not succeed here.  "[P]laintiffs making a procedural due-process claim must show that: (1) they were deprived of a protected interest, and (2) they did not receive the process they were due."  *Statewide Bonding,* 422 F. Supp. 3d at 41.  "Public employees who retain a property interest in their employment have a right to procedural due process."  *Kelley*, 893 F. Supp. 2d at 123.  The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner."  *Mathews v. Eldridge*, 424 U.S. 319, 332–33 (1976).  "The Fifth Amendment only requires that a person receive his or her due process, not every procedural device that he or she may claim or desire."  *Kelley*, 893 F. Supp. 2d at 123.  "Due process is flexible and calls for such procedural protections as the particular situation demands."  *Eldridge*, 424 U.S. at 334.

To begin with, the Supreme Court has held that the remedies and procedures provided in the Civil Rights Act of 1964 are exclusive where the Act applies.  *See Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 835 (1976).  In other words, "[t]he Title VII remedy declared exclusive for federal employees in *Brown v. GSA* precludes actions against federal officials for alleged

constitutional violations as well as actions under other federal legislation." *Kizas v. Webster*, 707 F.2d 524, 542 (D.C. Cir. 1983).  To that end, "this circuit has repeatedly held that federal employees may not bring suit under the Constitution for employment discrimination that is actionable under Title VII." *Ethnic Emps. of Libr. of Cong. v. Boorstin*, 751 F.2d 1405, 1415 (D.C. Cir. 1985).  But Title VII does not "prevent federal employees from suing their employers for constitutional violations against which Title VII provides no protection at all." *Boorstin*, 751 F.2d at 1415.

Here, Tarquinii's due process claim appears to merely "recast [her] Title VII claims as [a] constitutional claim[]." *Id.*  When a plaintiff merely states that an agency deprived her of her right to her employment position without due process—in conjunction with a Title VII claim— judges in this District have held that the plaintiff merely recast her Title VII claims.  *See Duffy v. Dodaro*, No. 16-cv-1178, 2020 WL 1323225, at *7 (D.D.C. Mar. 21, 2020); *see also Hester v. Mayorkas*, No. 21-cv-639, 2022 WL 4464876, at *4 (D.D.C. Sept. 26, 2022), *aff'd sub nom. Hester v. Burrows*, No. 22-5312, 2023 WL 3829323 (D.C. Cir. June 2, 2023) (holding preempted plaintiffs "constitutional claims are based on alleged misrepresentations during disciplinary investigations and EEOC proceedings" and "lack of due process" because those "employment disputes are addressed by Title VII").  That is the situation here because it does not appear that Tarquinii raises any due process claim unrelated to the employment action that she complained of through the Title VII procedure.  Rather, Tarquinii appears to argue that she was terminated for discriminatory and retaliatory reasons.  Accordingly, the Court concludes that a stand-alone due process claim is not viable here.

A stand-alone due process claim would also fail under the Civil Service Reform Act ("CSRA").  The CSRA "comprehensively overhauled the civil service system" and created an

"elaborate new framework for evaluating adverse personnel actions against federal employees." *United States v. Fausto*, 484 U.S. 439, 443 (1988) (internal citations and alterations omitted). Not every federal employee, however, is entitled to these protections.  *Id.*  The Supreme Court has held that "the CSRA's 'elaborate' framework demonstrates Congress' intent to entirely foreclose judicial review to employees to whom the CSRA denies statutory review."  *Elgin v. Dep't of Treasury*, 567 U.S. 1, 11 (2012).  "The D.C. Circuit has summarized the exclusivity of the CSRA succinctly: 'what you get under the CSRA is what you get.'"  *Lamb v. Holder*, 82 F. Supp. 3d 416, 421 (D.D.C. 2015) (quoting *Fornaro v. James*, 416 F.3d 63, 67 (D.C. Cir. 2005)); *Powers v. U.S. Dep't of Homeland Sec.*, No. 1:24-cv-01915, 2024 WL 3741415, at *1 (D.D.C. Aug. 1, 2024) ("The Civil Service Reform Act . . . provides the exclusive remedy for adjudicating plaintiff's wrongful removal claim.").

As an employee of a nonappropriated fund instrumentality, *see* Def.'s MSJ, Ex. 1 at 74, ECF No. 60-4.  Tarquinii is excluded from the CSRA provisions regarding termination, and therefore her termination is not subject to this Court's judicial review.  *See Perez v. Army & Air Force Exch. Serv.*, 680 F.2d 779, 787 (D.C. Cir. 1982) (concluding that employees of nonappropriated fund instrumentalities are not employees within the meaning of 5 U.S.C. § 7511, which governs employee termination under the CSRA); *cf., Filebark v. U.S. Dep't of Transp.*, 555 F.3d 1009, 1014 (D.C. Cir. 2009) (citing *McAuliffe v. Rice*, 966 F.2d 979, 980–81 (5th Cir.1992) for the proposition that employees of nonappropriated fund instrumentalities are exempted from the CSRA and therefore that the Court lacks jurisdiction to assess termination claims by employees of nonappropriated fund instrumentalities); *see also Vela v. Dep't of Navy*, 178 F.3d 1314 (Fed. Cir. 1999) (holding that employees of nonappropriated fund instrumentalities are excluded from the protection of 5 U.S.C. § 7511); 5 U.S.C. § 2105(c)

(specifying that an employee "paid from nonappropriated funds of the . . . Marine Corps exchanges . . . . and other instrumentalities of the United States under the jurisdiction of the armed forces . . . is deemed not an employee for the purpose of . . . laws administered by the Office of Personnel Management").  The remedial scheme of the CSRA precludes Tarquinii's claim because "it is the comprehensiveness of the statutory scheme involved, not the 'adequacy' of specific remedies extended thereunder, that counsels judicial abstention."  *Spagnola v. Mathis*, 859 F.2d 223, 227 (D.C. Cir. 1988).

Even if Tarquinii could bring her due process claim under the CSRA—for "[m]ixed cases, . . . those involving both an agency action reviewable by the [Merit Systems Protection Board ("MSPB")] (e.g., removal) and allegations that the action was motivated by discrimination prohibited by federal statute"—her due process claim must first have been exhausted before the MSPB before this Court will review it.  *Koch v. White*, 251 F. Supp. 3d 162, 169 (D.D.C. 2017), *aff'd sub nom. Koch v. Clayton*, No. 17-5180, 2018 WL 4871160 (D.C. Cir. Sept. 19, 2018); *see also Anderson v. Garland*, No. 1:23-cv-02674, 2024 WL 3509481, at *5 n.4 (D.D.C. July 22, 2024) (explaining that while "[m]ixed case[s]. . . can eventually land in federal district court . . . the plaintiff must first bring such claims before the MSPB").  And even if her due process claim were exhausted before the MSPB, the Court "considers only whether the decision [of the MSPB] was 'arbitrary or capricious, obtained without compliance with lawful procedures, unsupported by substantial evidence[,] or otherwise not in accordance with law.'"  *Koch*, 251 F. Supp. 3d at 169 (citation omitted).  Tarquinii has pointed to no evidence demonstrating that she exhausted her due process claim before the MSPB.  Accordingly, the Court concludes that a due process claim is unavailable to Tarquinii here.

The Court observes, however, that some judges in this District have held that the CSRA does not preclude judicial review of constitutional claims where application of the CSRA would "deny any judicial forum for a colorable constitutional claim." *Coleman v. Napolitano*, 65 F. Supp. 3d 99, 104–05 (D.D.C. 2014) ("[T]his Court has subject matter jurisdiction to hear the plaintiff's constitutional due process claim, which cannot be reviewed under the CSRA."); *Lamb*, 82 F. Supp. 3d at 423 ("Given the D.C. Circuit's expressed preference for keeping the courthouse doors open to federal employees raising constitutional claims, the Court finds it has subject matter jurisdiction to hear these constitutional due process claims under the grant of federal question jurisdiction."); *Davis v. Billington*, 51 F. Supp. 3d 97, 109 (D.D.C. 2014) ("In keeping with the longstanding law of this Circuit that favors permitting plaintiffs the opportunity to bring constitutional claims for injunctive relief in the district court, the Court finds that the CSRA does not bar this Court's jurisdiction to address the plaintiff's constitutional claims"); *see also Spagnola*, 859 F.2d at 229 ("We do not suggest that the CSRA precludes the exercise of federal jurisdiction over the constitutional claims of federal employees and job applicants altogether."); *Suzal v. Dir., U.S. Info. Agency*, 32 F.3d 574, 586 (D.C. Cir. 1994) (Williams, J., concurring) (interpreting the Circuit's decision in *Spagnola* to mean that district courts may hear challenges to employment actions when the CSRA does not provide an adequate alternative route to judicial review); *Bowman v. Iddon*, 848 F.3d 1034, 1042 (D.C. Cir. 2017) (Tatel & Ginsburg, JJ., concurring) (distinguishing case from *Spagnola*, *Wilson*, and *Davis* because statutory "remedial scheme offer[ed] [plaintiffs] no rights or remedies at all"); *Abdelfattah v. U.S. Dep't of Homeland Sec.*, 787 F.3d 524, 534 (D.C. Cir. 2015) (explaining that "the CRSA did not preclude judicial review of . . . constitutional claims [based on federal employment actions] altogether").

However, even assuming *arguendo* that the Court has jurisdiction to review Tarquinii's constitutional due process claim despite her exclusion under the CSRA, Tarquinii's claim here would fail because she lacks a property right in her continued employment.  See *Lamb*, 82 F. Supp. 3d at 424 (holding that federal "employees not covered by the termination provisions of the CSRA, like [Tarquinii], have no . . . property right" in continued employment); *see also Garrow v. Gramm*, 856 F.2d 203, 208 (D.C. Cir. 1988) (explaining that federal employees without termination protections under the CSRA do not have property interest in continued employment).  Because Tarquinii was not deprived of any right protected by the Due Process Clause, her due process claim would also fail on the merits.  Thus, the Court grants the Agency summary judgment on Tarquinii's due process claim.[9]

## V.  CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (ECF No. 60) is **GRANTED** and Defendant's Motion to Seal (ECF No. 72) is **GRANTED**.   An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  September 26, 2024                    RUDOLPH CONTRERAS
                                              United States District Judge

---

[9] The Agency also moves to seal three of the exhibits Tarquinii attached to her opposition brief.  *See* Def.'s Mot. Seal, ECF No. 72.  Tarquinii has not opposed the motion to seal.  The Court may order that filings containing private information be made under seal.  *See* Fed. R. Civ. P. 5.2(d).  The documents at issue here involve the disciplinary proceedings of third parties. Given that the public interest in these documents is minimal, it does not appear that Tarquinii objects to sealing these documents, and the documents involve private information regarding third parties, the Court will order the relevant documents to be sealed.  *See United States v. Hubbard*, 650 F.2d 293, 317–24 (D.C. Cir. 1980).